**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**MINNEAPOLIS ELECTRIC STEEL CASTING COMPANY, Defendant.**

**Civ. No. 4–81–725.**

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 17, 1982.

Reuben Daniels and Rose Marie Baron, Senior Trial Attys., U.S. E.E.O.C., Milwaukee, Wis., for plaintiff.

Robert J. Hennessey and James M. Strother, Larkin, Hoffman, Daly & Lindgren, Ltd., Minneapolis, Minn., and Kevin P. Light, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

MacLAUGHLIN, District Judge.

This is an action under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* Plaintiff U.S. Equal Employment Opportunity Commission charges defendant Minneapolis Electric Steel Casting Company with subjecting Jannette Rae Olson to different terms and conditions of employment and discharging her because of her sex. The Court has jurisdiction over the parties and action pursuant to 28 U.S.C. §§ 451, 1343, and 1345. A trial before the Court was held on August 23, 24, 25, 26, 30, and 31, 1982. By agreement of the parties, this proceeding was limited to the issue of whether the defendant had violated Title VII. The issue of damages, if any, was reserved for another proceeding. This memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

FACTS

The plaintiff herein is the U.S. Equal Employment Opportunity Commission

(EEOC), an agency of the United States government charged with the administration of Title VII. The EEOC commenced this suit on November 2, 1981, on behalf of "charging party" Jannette Rae Olson (Olson).[1] Olson, a female resident of Minnesota, was employed by the defendant as a chipper-grinder.

Defendant Minneapolis Electric Steel Casting Company (the Company) operates a steel foundry that is engaged in the manufacture of castings for the mining industry. The foundry is located at 3901 University Avenue, N.E., Columbia Heights, Minnesota. At all times material to this suit, the Company was an employer licensed to do business in Minnesota and engaged in an industry affecting commerce within the meaning of section 701 of Title VII.

On or about July 29, 1979, Olson applied for employment with the defendant. Olson was interviewed by the defendant's labor relations assistant, Dwayne Christiansen (Christiansen), on August 8, 1979. Christiansen discussed with Olson the positions that were open and the defendant's 30-day probationary period for all new employees. Olson was told she could be discharged during the probationary period if her work was unsatisfactory or if she performed her duties in an unsafe manner. Christiansen told Olson that the Company did not have a policy prohibiting the employment of husbands and wives. Olson's husband was an employee of the defendant prior to July 29, 1979, and remained so at the time of trial. Olson did not receive a job offer at her August 8, 1979, interview.

Olson was interviewed again on August 28, 1979, by Daniel Donovan (Donovan), the finishing room superintendent. Donovan told her she was being considered for employment as a chipper-grinder in the cleaning department on the second or third shift.

Donovan explained a chipper-grinder's duties, which include removing excess metal from steel castings by using various grinding tools. Among the tools used by a chipper-grinder is a one inch by eight inch horizontal grinder (large grinder), which weighs approximately twenty to twenty-five pounds. The large grinder, which is air powered, has a disc approximately eight inches in diameter and one inch thick that turns at a rate of 8,000 revolutions per minute. Chipper-grinders frequently use the large grinder in performing their duties. During the interview with Donovan, Olson held the large grinder and said that she thought she would not have any difficulty in using it.

After undergoing a medical examination on August 29, 1979, and being told she was physically fit for employment, Olson reported for work on September 4, 1979, as a chipper-grinder on the defendant's second shift. Donovan introduced Olson to her supervisor, Bill Schofield (Schofield). Schofield, who had been promoted to his supervisory position on August 27, 1979, told Olson to concentrate on performing her job in a safe manner and not to be concerned with the quality and quantity of her work. Schofield asked Thomas Holley (Holley) and Steven Beals (Beals), experienced chipper-grinders, to demonstrate for Olson the operation of the grinding equipment and the proper procedures to use in grinding excess metal from the castings.

In performing their jobs, chipper-grinders often work at individual workbenches, which are thirty inches high and three feet square. The legs of the benches are joined by steel braces which are approximately eight to ten inches above the ground. A wire mesh shelf rests on top of the braces. An opaque spark shield is attached to one end of the workbench. *See* Exhibit B.

1. On October 3, 1979, Olson filed a charge alleging the defendant had engaged in employment discrimination because of Olson's sex. *See* Exhibit 1. Defendant was served with a notice of the charge and copy of the charge. After an investigation the plaintiff issued a letter stating that the plaintiff had determined there was reasonable cause to believe the charge was true and invited Olson and repre- sentatives of the Company to join in a collective effort to resolve the charge. The plaintiff was unable to secure a conciliation agreement between the parties. Olson's charge was initially received and processed by the plaintiff pursuant to an agreement with the Minnesota Department of Human Rights. The parties stipulated that deferral to the state agency is not at issue in this litigation.

The defendant contends it has a safety policy that requires all chipper-grinders to operate the large grinder with both feet on the ground. The policy prohibits chipper-grinders from resting their feet on the wire-mesh shelf of the workbench while operating the large grinder. Schofield testified that this policy is unwritten and not posted anywhere in the work area even though the collective bargaining agreement with union employees requires all safety rules to be posted. Schofield also testified that the unwritten policy was established in 1975 after two employees had been injured. According to Schofield, the policy's goal is to lessen the likelihood of a chipper-grinder being thrown off balance while operating the large grinder. All supervisory personnel and chipper-grinders who testified stated that the large grinder is capable of causing severe injury or even death. Other supervisory personnel confirmed Schofield's testimony concerning the existence and purpose of the unwritten safety policy.

The defendant contends Olson was discharged for continuing to violate this unwritten safety policy after repeated warnings. Olson worked full shifts on September 4, 5, 6, and 7, 1979. On Monday, September 10, 1979, after working about two hours, Olson experienced what she believed was a miscarriage. She reported the possible miscarriage to Schofield, who in turn reported it to Donovan. Both Donovan and Schofield stated that they were quite concerned about the incident. Olson was sent home and did not report to work until Wednesday, September 12, 1979, when she worked a full shift after presenting a medical clearance from her doctor. At the end of her shift on Thursday, September 13, 1979, Olson was asked by Schofield to join him and Donovan in Donovan's office. Donovan told Olson that she was a good worker, but that her employment was being terminated because she could not handle the large grinders.

The parties dispute the length of time Olson had to learn to operate the large grinder, the number of warnings she was given for violating the Company's unwritten safety policy, and the uniformity of the discipline imposed for violations of the policy. The Court finds that Olson operated the large grinder the equivalent of two and a half to three working days before her employment was terminated.[2] Several employees, including Holley, Dennis Aussing (Aussing), and Alan Peterson (Peterson), testified that it took at least a week of experience in using the large grinder before they were able to operate it properly. These employees also testified that during the first week they used the large grinder they experienced fatigue and numbness in their arms. Olson operated the large grinder for only half of the time needed to adjust to it before her employment was terminated.

The defendant claims it was justified in terminating Olson's employment because she repeatedly ignored warnings concerning her improper use of the large grinder.[3] Ol-

---

**2.** Olson operated the large grinder part of the day on five different days (September 6, 7, 10, 12 and 13, 1979). At the EEOC fact-finding conference held on March 5, 1980, Schofield himself testified that Olson had operated the large grinder only part of three days (September 7, 10, and 12). See Exhibit 43. At trial, a year and a half after the fact-finding conference, Schofield testified that Olson had operated the large grinder for most of six days. Schofield claimed his memory of events was clearer at trial than at the fact-finding conference. The Court finds Schofield's trial testimony concerning the length of Olson's experience with the large grinder lacks credibility.

**3.** The improper use of the large grinder is the only reason the defendant claims Olson was fired. Schofield, Olson's immediate supervisor, stated on an employee evaluation form that Olson produced work of acceptable quality, had an acceptable attendance record, and performed jobs as instructed and in accordance with safety standards. Schofield indicated, however, on the evaluation form that Olson was not producing an acceptable quantity of work and that she did not complete her work within an acceptable period of time. See Exhibit 13. Nevertheless, Schofield testified at trial that Olson's performance was satisfactory in every way except for the alleged safety violation. The Court infers that Olson's performance was satisfactory for the length of time she had been on the job but had not yet reached the desired level.

son testified that she was verbally warned only one or two times about improperly using the large grinder.[4] Schofield testified at trial that he warned Olson approximately twenty times over five days about her improper use of the grinder. Donovan testified that he warned her five or six times over four days. Both Schofield and Donovan testified that they remembered the exact time of day each of their warnings occurred even though they made no written record of their warnings and the warnings were given three years prior to trial.[5]

The Court finds Schofield's and Donovan's testimony lacks credibility. Schofield was unable to remember the date and time of day of the fact-finding conference he attended with EEOC officials a year and a half before trial, but he claimed to remember dates and times of verbal warnings given three years before trial. Both Schofield and Donovan appeared to have reconstructed the facts to buttress the Company's claim. The Court finds Olson was warned on occasion about resting her foot on the shelf, but the Court is convinced that these warnings occurred far less frequently than the defendant claims.

The defendant claims it uniformly enforced its unwritten safety policy against males and females, probationary and union employees. The evidence fails to support the defendant's claim. The Court finds that Olson was more closely watched than male employees, that the discipline imposed in her case far exceeded that given any male employee, and that the only discernible reason for this disparate treatment is that Olson is female.

Several male employees testified that they regularly violated the Company's unwritten safety policy by operating the large grinder with one of their feet resting on the workbench shelf. Beals, one of the two employees assigned to instruct Olson in the use of a chipper-grinder's tools, testified that he had a habit of resting the large grinder on his knee while his foot was elevated onto the workbench shelf. Beals stated he developed this habit after watching other employees who operated the large grinder in this manner. According to Beals, he showed Olson how to use each grinder, including his method of resting the large grinder on his knee while elevating his foot onto the workbench shelf. Beals stated that he used the grinder 70 to 75 percent of the time and that he elevated his foot almost 90 percent of the time he used the large grinder. Beals further testified that both of his supervisors—Harold Nelson (Nelson) and Schofield—had ample opportunity to see him operating the large grinder in this manner, but neither of them had ever spoken to him or warned him about his habit.

Holley, the other employee assigned to instruct Olson, testified that he had seen Beals using the large grinder with his foot elevated. In addition, Holley testified that

---

Schofield also made a few other negative comments about Olson's performance on the evaluation form. In particular, Schofield commented that Olson "[c]annot handle large grinders." *See* Exhibit 13. When questioned about these negative statements, Schofield testified that Olson only had one problem as an employee—she continued to operate the large grinder with her foot resting on the workbench shelf—and the negative comments on the evaluation form were directed at this single problem.

Schofield stated he gave Olson a satisfactory safety rating despite the alleged repeated violations of the unwritten safety policy because her raised foot was her "only problem as far as safety was concerned." Despite Schofield's repeated emphasis at trial that Olson was a good employee with "only one problem," Schofield

stated he agreed with Donovan's decision to terminate Olson's employment.

4. Olson testified that she believed she was being warned against resting the large grinder against her body and pushing the grinder with her body. Both Schofield and Donovan testified that employees were permitted to rest the large grinder against their bodies for leverage as long as both of their feet were on the floor.

5. The only written record of warnings given to Olson was an entry in Donovan's logbook which stated in part that she had been reminded several times that she could not use her leg to support the grinder while she had her foot raised on to the bottom platform of the grinding bench. The date and number of warnings were not mentioned in the logbook.

although he often checked on Olson he had never seen her operate the large grinder with her foot elevated. Thus, although Holley worked close to Olson and was specifically assigned by Schofield to instruct her and to keep watch on her progress, he never saw her operating the large grinder in violation of the Company's unwritten safety policy. The Court finds Holley and Beals convincing and credible witnesses.

Aussing's testimony corroborated that of Beals. Aussing, another male chipper-grinder, testified that he rested the large grinder on his knee while his foot was elevated on the workbench shelf whenever he felt fatigued. In addition, Aussing testified that about one half of the chipper-grinders also operated the large grinder in this manner from time to time. Aussing stated that he had never been warned about this practice nor seen anyone else warned about this practice despite the frequent presence of supervisors in the work area.

The defendant claims that supervisors were unaware of these safety violations by other employees and that whenever supervisors became aware of such a practice, they immediately acted to prevent its reoccurrence. The Court finds the evidence fails to support the defendant's claims. Exhibit 42 supports the plaintiff's claim that there were numerous violations of the unwritten safety policy and numerous opportunities to view them.

Exhibit 42 is a photograph of a male chipper-grinder operating a large grinder with the grinder resting on his knee while his foot is elevated on the workbench shelf. The picture was taken by Granville Gutterson (Gutterson), who was an investigator for Minnesota's Occupational Safety and Health Administration. Gutterson took the picture as part of a routine inspection for noise, dust, and chemical pollutants in the workplace. Although the purpose of the picture was to show the location on the employee of a device that measured silica dust, the picture also illustrates the employee's violation of the company's unwritten safety policy. Gutterson testified that there were supervisors in the work area at the time he took the picture and that as far as he knew none of them spoke to the pictured employee about his improper operation of the large grinder. Exhibit 42 corroborates the testimony of Beals and Aussing that such safety violations were commonplace and often went undisciplined.

The defendant attempted to support its claim that it uniformly enforced its unwritten safety policy by testimony describing various cases of such enforcement. Much of this testimony is suspect because the incidents often occurred soon after the supervisor learned of the present litigation. For example, Schofield testified that the only times he saw other employees violating the unwritten safety policy between September, 1979, and the trial date was in early June and August of 1982. On both occasions Schofield testified he warned the employees not to violate the policy again. Interestingly, Schofield's deposition was taken on May 11, 1982. Similarly, Nelson, who has been a supervisor in the cleaning department since 1978, testified that he had only seen one violation of the Company's unwritten safety violation and it occurred in April, 1982. Nelson stated he verbally warned the male employee and the incident was not repeated. Despite supervising Beals and Aussing, Nelson claimed he never saw them violate the safety policy. The Court can only conclude that either the supervisors failed to watch the male employees as closely as they watched Olson[6] or that they ignored the safety violations of the male employees.

The defendant argues that the plaintiff failed to show that other male probationary employees were treated differently than Olson. The Court has no reason to assume that Beals and other chipper-grinders who

---

6. Ramon Ramirez, the general superintendent of the finishing room, testified that he told Donovan after Olson thought she had a miscarriage on September 10, 1979, to be sure to watch Olson carefully. Although the motive for carefully watching Olson may well have been concern for her personal safety, the effect of this "careful" watching was disparate treatment.

violated the unwritten safety policy waited until their probationary period ended before they operated the large grinder improperly. In fact, the opposite conclusion is more likely. Given the fatigue and numbness experienced by new employees, it is much more likely that they would rest the large grinder on their elevated legs than would more experienced employees. The evidence established that Olson is the only probationary employee who was ever discharged for violating the Company's unwritten safety policy.

DISCUSSION

■ The plaintiff in a Title VII case possesses the burden of persuasion and the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Williams v. Trans World Airlines, Inc.,* 660 F.2d 1267, 1270 (8th Cir.1981). In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court set forth flexible guidelines for establishing a prima facie case of discrimination.

> (i) that [plaintiff] belongs to a racial minority; (ii) that [plaintiff] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite ... qualifications, [plaintiff] was rejected; and (iv) that, after ... rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824.

■ After the plaintiff establishes a prima facie case of discriminatory conduct, the defendant possesses the burden of producing a legitimate nondiscriminatory reason for its action. The plaintiff, nevertheless, retains the burden of persuading the factfinder that the defendant illegally discriminated against the plaintiff by showing that the defendant's articulated reason is a mere pretext for discriminatory conduct. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 260, 101 S.Ct. at 1097

(1981); *Washington v. Kroger Co.,* 671 F.2d 1072, 1077 (8th Cir.1982); *Vaughn v. Westinghouse Electric Corp.,* 620 F.2d 655 (8th Cir.1980), *vacated,* 450 U.S. 972, 101 S.Ct. 1504, 67 L.Ed.2d 808 (1981).

The *McDonnell Douglas* guidelines have been applied to discharge and sex discrimination cases as well as to hiring and racial discrimination cases. *See, e.g., Williams v. Trans World Airlines, Inc.,* 660 F.2d 1267, 1271 (8th Cir.1981). These guidelines are not inflexible. The United States Supreme Court has stated that the "facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required ... is not necessarily applicable in every respect in differing factual situations." *McDonnell Douglas,* 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13, *quoted in Texas Department of Community Affairs v. Burdine,* 450 U.S. at 253–254 n. 6, 101 S.Ct. at 1093–94 n. 6.

■ The Court concludes that the plaintiff succeeded in establishing by a preponderance of the evidence a prima facie case of employment discrimination based on sex. Olson, a female, belongs to a protected group. In addition, as Company officials admitted, she performed her job as a chipper-grinder satisfactorily except for her violation of the Company's unwritten safety policy. Her violation of the safety policy cannot be condoned. Olson may well have endangered herself. However, the plaintiff has clearly demonstrated that male employees routinely committed identical violations and were not disciplined. These violations were well known among the employees, and the Court is convinced that the supervisors were aware of these violations and took no action to discipline the male employees. The Company, however, discharged Olson allegedly because of her violation despite the fact that she was otherwise performing her duties satisfactorily. The Company only gave her approximately half the time necessary to adjust to the large grinder. The plaintiff has succeeded in showing that the Company's actions create an inference that it is more likely than not that such actions were based on a discriminatory cri-

terion illegal under Title VII. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957 (1978).

■ The Court rejects the defendant's contention that the plaintiff's prima facie case must fail because the plaintiff did not introduce evidence that Olson's position remained open or that she was replaced by a male. Although such evidence is often included in a prima facie case, it is not an absolute requirement. *See, e.g., Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1253 (8th Cir.1981) (three elements necessary to establish a prima facie case of disparate treatment in a discriminatory discharge case: first, plaintiff was a member of a protected class; second, plaintiff was capable of performing the job; and third plaintiff was discharged from the job). As the United States Supreme Court itself noted, the guidelines for establishing a prima facie case are flexible. *McDonnell Douglas,* 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13.

■ The ultimate issue is whether the defendant discriminated against a particular employee. As the United States Court of Appeals for the Fifth Circuit has noted, "[i]f an employee is discharged under circumstances in which an employee of another sex would not have been discharged, an inference of discrimination arises irrespective of the gender of the employee's replacement." *EEOC v. Brown & Root, Inc.,* 688 F.2d 338, 340 (5th Cir.1982). The fact that a discharged woman is replaced by a woman does not prevent a showing of discrimination under Title VII. The Court does not merely examine whether protected individuals as a group are treated in a nondiscriminatory manner. Title VII protects individual employees from discriminatory acts. The United States Supreme Court has stated that "[i]t is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." *Connecticut v. Teal,* — U.S. —, —, 102 S.Ct. 2525, 2535, 73 L.Ed.2d 130 (1982). Thus, although the defendant's actions concerning other female employees may have been exemplary, the defendant is not permitted to discriminate against Olson on the basis of her sex.

■ In response to the plaintiff's prima facie case, the defendant claims it was justified in discharging Olson because of her safety violations. Although the Company is to be commended for its concern for the safety of its employees, it cannot use its safety policy to cloak discriminatory conduct from Court scrutiny. The Court is convinced that male employees, both probationary and union employees, routinely violated the Company's unwritten safety policy, that Company officials were aware of these violations, and that these officials failed to enforce the unwritten safety policy as strictly against the male employees as they did against Olson. The Company subjected Olson to harsher discipline than any other employee. Company officials watched her more carefully or responded to her violations more quickly and severely than they did to male employees. These conclusions are further supported by the Court's findings concerning the short period of time Olson was allowed to work before her employment was terminated. The plaintiff has succeeded in showing that the Company's safety policy was a mere pretext for her discharge.

The Court concludes that the evidence as a whole clearly and convincingly demonstrates that the Company's action in terminating Olson's employment was motivated by the illegal consideration of Olson's sex and that Olson's discharge presents a clear case of illegal disparate treatment of a female employee which the Court must not, and will not, condone.

Accordingly, IT IS HEREBY ORDERED that the plaintiff is entitled to entry of judgment against defendant Minneapolis Electric Steel Castings Company because of its discharge of Olson in violation of Title VII.

Further, IT IS ORDERED that entry of judgment shall be stayed sixty days from the date of this Order, with leave to the

parties to request a further stay for good cause. During this sixty-day period, the parties, as they agreed prior to trial, shall attempt to resolve the issue of damages to their mutual satisfaction. At the end of the sixty-day period if the issue of damages remains unresolved, either party may apply to the Court for a hearing and a determination of the amount of damages to which Olson is entitled.