**Eleanor KRAMER–NAVARRO, Plaintiff,**

v.

**William BOLGER, individually and as Postmaster General of the United States Postal Service, United States Postal Service, Peter Bottiglieri, Timothy Connors and William Sutherland, Defendants.**

**No. 82 Civ. 5635.**

United States District Court,
S.D. New York.

May 10, 1984.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff; Patricia McConnell, Joseph J. Garcia, New York City, of counsel.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant Bolger; Jordan Stanzler, Frederick M. Lawrence, Asst. U.S. Attys., New York City, of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

On September 10, 1981, Eleanor Kramer-Navarro ("Kramer-Navarro"), the plaintiff herein, was discharged from her job as a part-time flexible distribution and window clerk at the United States Post Office in Ardsley, New York.[1] After complying with administrative requirements of the federal civil rights laws, she commenced the instant action against the Postmaster General, William Bolger, and the United States Postal Service (collectively, "the defendants"), alleging in the alternative that she was terminated on the basis of her sex and in retaliation for her filing of a sex discrimination complaint with the United States Postal Service Equal Employment Opportunity ("EEO") Office or that she was so "sexually harassed" by her co-workers that she was constructively discharged.[2] Kramer-Navarro seeks back pay, reinstatement, injunctive orders requiring "affirmative" steps to rid Ardsley facility of alleged discriminatory practices, attorneys' fees, and costs. Upon a trial to the Court, Kramer-Navarro testified in support of her claims. Witnesses called by defendants included Ardsley Postmaster Karl P. Seidel ("Seidel"), who issued Kramer-Navarro's termination notice, several of plaintiff's co-workers, her EEO officer, and a member of her union.

Based upon a word by word reading and study of the stenographic transcript of the trial, the demeanor of the witnesses, an evaluation of their credibility and the reasonable inferences to be drawn from established facts and surrounding circumstances,[3] the Court is persuaded that Kramer-Navarro failed to carry her burden of showing that her termination was motivated by an intent unlawfully to discriminate or to retaliate against her or that she was so harassed on account of her sex that she was constructively discharged.[4] The defendants are entitled to judgment on the merits dismissing her claims.

Plaintiff's stormy history over an eight-month period at the Ardsley Post Office, which culminated in her discharge, was prefigured at her initial interview in late January or early February 1981. At the interview, plaintiff discussed with Seidel her impressive educational background, which included a B.A. degree from Brooklyn College, a masters degree in urban affairs from Hunter College, and experience as an adjunct professor of sociology at Rockland Community College and Westchester Community College. Seidel made the not unjustified observation that she appeared overqualified for the job—which involved sorting mail for route distribution, selling stamps and other products to the public, setting postage meters, loading mail trucks, collecting mail, and, from time to time, carrying mail—and that she might find her tasks menial, repetitive, and boring. Her response, entirely unprovoked, was " 'don't give me that ["]overquali-

---

1. Plaintiff was formally notified of her termination on September 10, 1981. The collective bargaining agreement governing her termination required that she be maintained on the Postal Service employment rolls until at least October 16, 1981. Plaintiff's termination date was later extended to October 23, 1981.

2. *See* 42 U.S.C. §§ 2000e–2(a), 2000e–3(a), 2000e–16(a) (1982). Plaintiff also claims she was discriminatorily denied a transfer to another postal facility. *See id.* § 2000e–2(a)(1). By

orders dated July 11, 1983, the Court dismissed plaintiff's claims that she was discriminatorily denied sick leave for her absence from work on September 8, 1981, and thereafter, and dismissed plaintiff's state law tort claims for lack of jurisdiction.

3. *See Fuller v. Dilbert,* 244 F.Supp. 196, 202 (S.D.N.Y.1965), *aff'd,* 358 F.2d 305 (2d Cir.1966).

4. *See also infra* note 40 (denial of transfer).

fied["] bullshit.' " [5] Upon the trial, plaintiff testified she responded as she did out of a suspicion that Seidel was trying to rule her out of a job for which she was otherwise qualified, but the comment fairly carried with it a deeper significance and forecast future events: Kramer-Navarro was basically unwilling or unable to reconcile her training and skills to the routine nature of tasks properly within the job requirements of a part-time flexible clerk. Although her comments did not deter Seidel from appointing her, an attitude of intellectual superiority toward her co-workers was manifest on numerous occasions in which she resisted carrying out her assigned duties or blamed others for her own mistakes.

Although Kramer-Navarro's sixty-day evaluation indicated her "[w]illingness to handle all assignments" was satisfactory, it also revealed that she was slow in carrying out her assigned tasks.[6] Plaintiff's work habits were a continual source of controversy among the lower-level staff. Peter Bottiglieri ("Bottiglieri"), at the time of Kramer-Navarro's appointment a regular window clerk at Ardsley who, along with William Sutherland ("Sutherland"), a more senior part-time flexible clerk, was assigned to train plaintiff, testified she resisted instructions and wasted time making the outgoing mail "neat" when it would only be dumped in a pile after shipment from Ardsley to the Postal Service processing center at Mount Vernon, New York. Bottiglieri also testified that plaintiff resisted other duties and performed her required tasks only when senior management was present. Plaintiff, on the other hand, testified she believed Bottiglieri did not train her properly or give her adequate assistance. The ill feeling between the two erupted in a heated argument in late May, 1981.

Another incident in May, between plaintiff and Sutherland, illustrates the causes of plaintiff's frequent arguments with her more senior co-workers. One day she reported for work wearing "little pumps" or "open toe[d]" shoes in violation of a Postal Service regulation requiring employees to wear flat, covered shoes for stability and protection—an employee safety regulation. She was informed of this violation by Seidel's second in command at Ardsley, Superintendent of Postal Operations Nicholas F. Scallero ("Scallero"). Plaintiff complained to Scallero of the expense of regulation shoes, and, when Scallero reminded her that he could have ordered her off the floor she immediately went to Sutherland, the shop steward for the American Postal Workers Union, of which she was not a member,[7] and complained to him about the expense of safety shoes and demanded to know who was going to pay for them. Sutherland explained that the Postal Service did not pay for employees' safety shoes and that she would have to pay for them herself. She responded with an obscenity. Later that day, she demanded to know of Sutherland why the union failed to obtain an allowance for the shoes. When Sutherland responded that the union had not won an allowance in the national agreement, she berated the union, and Sutherland, for being a member of it, again using profane language, to which Sutherland responded in kind.

Plaintiff then submitted a written complaint to Seidel that she was being "bullied" by the male workers, in particular Bottiglieri and Sutherland, and wished to be transferred. Seidel sought out the male workers' side of the story and held a meeting on May 29, 1981, with plaintiff and the two men. There Seidel, who had not personally witnessed any of the outbursts,[8]

---

**5.** Tr. 188; *see id.* at 96.

**6.** Plaintiff's Ex. 12.

**7.** Although plaintiff was represented in collective bargaining talks and grievance procedures by the American Postal Workers Union, she joined the National Association of Letter Carri-

ers because of a preference for its medical plan. *See* Tr. 23, 293.

**8.** Seidel had been telephoned at home, however, to arbitrate a dispute between Kramer-Navarro and Sutherland involving the accounting of money received by plaintiff while on duty at the customer window. The dispute, which, as not-

said he would not take sides among the three, and that in any future instance in which employees "got into it and started screaming at each other" he would "take corrective disciplinary action." Seidel specifically instructed Kramer-Navarro, however, that as the most junior employee she was to obey the more senior clerks when he or Scallero were not present. Kramer-Navarro appeared to accept this advice and abandoned, for a time, her efforts to obtain a transfer.[9]

Despite the resolution of the May 29 meeting, Seidel continued to receive complaints from his employees that Kramer-Navarro wasted time by failing to abide by established office practices and that plaintiff used obscenities in rebuffing the orders of her superiors.[10] In fact, as Postmaster Seidel's testimony indicates, because of plaintiff's intransigence, he was called upon personally to complete work that plaintiff failed to finish.[11] Throughout spring and early summer, plaintiff continued in her self-righteous disrespect for the greater experience and authority of the senior workers. In an incident on July 17, 1981, for example, plaintiff refused to obey Bottiglieri's order that she comply with office practice in accounting for money she took in from the public.[12] After Scallero

upheld Bottiglieri, plaintiff followed the order, but then immediately wrote to Seidel to register "a formal complaint against Bottiglieri," concerning his "order[ing] people around" and "abuse."[13] Plaintiff followed up on this letter on August 3, 1981, with more correspondence to Seidel, in which she complained of Bottiglieri's "erratic, spiteful, subversive, irresponsible, [and] demeaning" behavior and requested an "immediate" transfer.[14] A week later, Seidel replied in writing. He noted Bottiglieri and Kramer-Navarro had failed "to work together in harmony" and informed plaintiff of the process for obtaining a transfer.[15] Seidel also instructed Kramer-Navarro in the procedure for filing a sex discrimination charge with the Postal Service's administrative office—which plaintiff did the next day.[16] Yet although he held "both sides equally responsible for the current situation," he warned plaintiff that he "had complaints about you from other employees regarding your attitude and behavior towards them," and that he was "considering the exercise of my contractual rights under the disciplinary article of the [n]ational [a]greement as a solution to the next incident."[17]

The "next incident" was not long in coming. On August 28, 1981, in another dis-

---

ed *infra,* occurred a number of times during Kramer-Navarro's tenure, arose from plaintiff's belief that her funds should be counted by another employee without knowledge of the figure Kramer-Navarro had arrived at herself. The trial record establishes that the practice at Ardsley was that the clerk designated to check the count of a co-worker was to be informed of the co-worker's count before counting the funds a second time. The record was bare of any indication that this practice was unauthorized, unsound, or failed to protect Kramer-Navarro from charges of negligence. *See* Tr. at 119, 297–98.

9. Tr. 36–38. In June, 1981, plaintiff, with the backing of Seidel and Scallero, unsuccessfully applied for a transfer and promotion to a position in Washington, D.C. Plaintiff's Ex. 14.

10. *See* Tr. 210–15.

11. *Id.* at 214–15.

12. *See supra* note 8.

13. Plaintiff's Ex. 7; *see* Tr. 111–16.

14. Plaintiff's Ex. 7. Plaintiff also complained that the letter carriers were unjustifiably refusing to speak to her. *See* Tr. 45–49.

15. Seidel instructed plaintiff that if she wished to obtain a transfer she was required to obtain the consent of the postmaster at the facility she wished to be transferred to. Joint Ex. 3. The record does not indicate that after receiving this instruction plaintiff ever took this initial step, even though her EEO officer reiterated that contacting the new place of employment was her responsibility. Tr. 359. Kramer-Navarro evidently believed, erroneously, that Seidel and EEO officer William Malson, Jr., were arranging a transfer for her, *see* Tr. 71; her testimony indicates, however, that she did not wish to be transferred, *see id.* at 132, and that her prime concern was that Seidel and Malson "la[y] down the law," *id.* at 72, at Ardsley.

16. Tr. 133.

17. Joint Ex. 3.

pute with Bottiglieri over the counting of money, plaintiff threatened her co-worker with bodily harm after Bottiglieri informed Scallero that Kramer-Navarro would not employ the proper procedure and Scallero told plaintiff to comply. This incident was witnessed by Scallero and immediately reported by Bottiglieri to the office of the postal inspector, whose representative investigated the matter and took sworn statements from plaintiff and Bottiglieri. Seidel, however, took no action against Kramer-Navarro pending completion of the postal inspector's preliminary report.

Prior to the receipt of that report, however, plaintiff was involved in yet another incident, this time with Seidel himself. On September 8, 1981, the first work day after Labor Day, Kramer-Navarro was scheduled to begin work about noon. At about 7:30 a.m., Seidel received a certified letter plaintiff had mailed the previous Saturday. In her letter Kramer-Navarro requested indefinite "sick leave," but gave no indication of the illness she suffered from, other than "anxiety" and "stress." [18] Seidel telephoned Kramer-Navarro at her home, and with respect to his conversation with her, testified:

> I directed her to return to duty. I told her that the letter did not—was not a proper application for sick leave [, t]hat for her to be out for an extended period she would require medical documentation. At that particular point she started over-shouting everything I was saying, screaming into the phone. There were some obscenities and the last thing I remember was "go to hell" and she hung up the phone on me.[19]

Later that day, plaintiff telephoned the Mount Vernon postal facility where Seidel was working on temporary assignment and left a message with another worker there to inform Seidel that he was "no longer to have any direct contact with her." [20] Kramer-Navarro did not dispute the substance of her comments.[21]

On September 10, 1981, Seidel, having received no medical documentation to back Kramer-Navarro's request for sick leave, mailed to plaintiff a "Notice of Removal," stating that her employment with the Postal Service would terminate at the close of business on October 16, 1981.[22] The notice informed plaintiff that she was being discharged for her "loud and abusive" conduct, her failure to comply with Postal Service leave regulations, and her absence without official leave.[23] Noting that plaintiff had previously disobeyed postal regulations,[24] Seidel also stated that Kramer-Navarro's unauthorized absence and abusive conduct were "not the first incident in which you have refused to accept direction" and that "[y]our behavior was identical in similar situations with other employees at this post office." Seidel stated that plaintiff's various acts were "indicative of a behavior pattern which cannot be tolerated in an industrial situation."

■ Thereafter, upon receipt of the preliminary report of the postal inspector, Seidel again wrote plaintiff on September 16, 1981, to amend the earlier notice to include as an additional ground for discharge plaintiff's statement to Bottiglieri, described as "threaten[ing] to have both of his arms and legs broken and to have him taken care

---

**18.** Plaintiff's Ex. 9. Kramer-Navarro made other, vague references to "trauma," "anguish," and "fear." *Id.*

**19.** Tr. 222.

**20.** *Id.*

**21.** *Id.* at 77.

**22.** Joint Ex. 1.

**23.** *Id.*

**24.** In particular, Seidel stated that Kramer-Navarro had "persisted with [a] request" to use a

cart to carry mail on a delivery route that was not approved for cart delivery. *Id.* Seidel testified that he initially refused such a request because the route in question would require plaintiff to leave the cart unattended, threatening the security of the mails. Tr. 208–09. Seidel also testified that during his absence from Ardsley plaintiff evaded this order by seeking approval for use of the cart from the supervisor then on duty. *Id.* at 209. Plaintiff did not dispute this charge.

of." Seidel specifically noted that the threat against Bottiglieri was made in the presence of Superintendent Scallero. The notice extended the effective date of her discharge to October 23, 1981, and she was removed from the rolls on that date. Her discharge was unsuccessfully grieved by the American Postal Workers Union.[25]

 There can be no doubt that the stated reasons for Kramer-Navarro's discharge are "legitimate, nondiscriminatory,"[26] and nonretaliatory[27] reasons for her termination. It was plaintiff's burden "to demonstrate that the proffered reason[s] w[ere] not the true reason[s] for the employment decision."[28] Kramer-Navarro did not come close to sustaining this burden.

As noted above, in issuing the first letter of termination, Seidel, who at that time had not received the report of the office of the postal inspector concerning the threat against Bottiglieri, relied on Kramer-Navarro's failure to report to work,[29] in contravention of a direct order, or to justify her absence with appropriate medical documentation, taken in the context of other infractions plaintiff had committed during her tenure. There was not the slightest shred of evidence that any other employee, male or female, who had so breached their duties, had been treated more leniently than was plaintiff.[30] Although Kramer-Navarro attempts to show that others, had they been in the same position, would have been treated differently, the evidence does not sustain such a claim. Whatever Seidel's tolerance for the actions of others,[31] it does not, without more, establish that his reliance on Kramer-Navarro's insubordinate conduct, failure to report to work, and other actions as grounds for discharging her, was a pretext for discrimination or retaliation. Seidel's disciplinary decision, which distinguished between employees like Bottiglieri and Sutherland, who shouted and swore at their colleagues, and Kramer-Navarro, who, in addition to swearing at her co-workers, disobeyed direct orders to report for work, violated Postal Service leave policy, and told the officer in charge of her facility to "go to hell," was an entirely valid, nondiscriminatory, and nonretaliatory business judgment.[32] Plain-

---

**25.** *See supra* note 7. The Court recognizes that the Civil Rights Act of 1964 does not permit "deferral" to the results of arbitration proceedings adjudicating employment disputes pursuant to a collective bargaining agreement, *see Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 55–60, 94 S.Ct. 1011, 1023–1025, 39 L.Ed.2d 147 (1974). The arbitration proceeding, its findings, and determinations, play no part in the Court's judgment.

**26.** *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *see United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (*quoting Burdine*); *Zahorik v. Cornell Univ.,* 729 F.2d 85, 92 (2d Cir.1984).

**27.** *See Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980); *see also Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982) (allocation of burdens with respect to proof of claims of retaliation); *Burrus v. United Tel. Co.,* 683 F.2d 339, 343 (10th Cir.) (same), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633

**28.** *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

**29.** The only plausible construction to be placed on Seidel's deferred consideration of the August 28, 1981, incident as a ground for terminating plaintiff is that he wanted to give Kramer-Navarro the benefit of the independent judgment of the office of the postal inspector.

**30.** *See* Tr. 236, 274.

**31.** Seidel testified that on at least one occasion he told Kramer-Navarro "to ignore Mr. Bottiglieri's screaming ...." Tr. 266.

**32.** The greater disruptive effect, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 806 n. 21, 93 S.Ct. 1817, 1826 n. 21, 36 L.Ed.2d 668 (1973), of Kramer-Navarro's conduct was amply illustrated by Postmaster Seidel:

> I had someone who told me that they were not going to come to work. The letter didn't state how long she was going to be out, when she would be back, if she would be back and then our subsequent conversations led us to believe that I had somebody who wanted to stay out and I just couldn't afford to have somebody in my work place with that type of attitude, that type of behavior—and I also needed somebody to work. I was shorthanded.

Tr. at 279. As the "work rule" cases illustrate, Seidel was under no obligation to treat Kramer-

tiff's claimed ignorance of the leave requirements, even if true,[33] would not show that Seidel acted from a disciminatory or retaliatory motive. Plaintiff's other allegations of disparate treatment are equally without substance.[34]

Kramer-Navarro also failed to show any sexually discriminatory or retaliatory motive behind Seidel's inclusion of Bottiglieri's charges as an additional ground for termination. As noted above, Seidel, who did not personally witness the threat against Bottiglieri, deliberately held off acting on Bottiglieri's complaint until he received the investigative report of the postal inspector. Plaintiff made no showing that the report, which Seidel stated in his notice of termination supported Bottiglieri's charge that Kramer-Navarro "threatened to have both of his arms and legs broken and to have him taken care of," was known by Seidel to be incorrect in any material respect. Although at trial plaintiff denied she used the precise language attributed to her, she admitted, both in her testimony and in a sworn affidavit given to the office of the postal inspector, that she told Bottiglieri "he deserved to get hurt or have something broken."[35] Plaintiff admitted, as well, that she made the threatening remarks in front of Superintendent Scallero. Whatever her actual words at the time of the

incident, the record leaves no doubt that the substance of her language was a threat of physical injury or harm to Bottiglieri. Given her other misconduct, the attendant circumstances, and her admissions at the time, there can be no question that Seidel believed when he wrote the amended notice of termination that plaintiff had threatened a co-worker with physical harm—that the alleged threat was the true reason for the amended notice. As Postmaster Seidel acknowledged in the amended notice of termination, wholly aside from the danger posed to other employees, the August 28 incident, which arose from plaintiff's "refusal to comply with local procedure," illustrated Kramer-Navarro's inability to get along with fellow employees, her refusal to follow proper procedures, her refusal to follow orders, and her inability to conduct herself in a proper manner with respect to the discharge of her assigned duties. Plaintiff's claim that she reported similar threats against her by her co-workers yet Seidel took no disciplinary action is not borne out by the record.[36] Indeed, the record reflects that, time after time, Seidel bent over backwards to be fair and patient with Kramer-Navarro and to give her every benefit of the doubt.

Nor does the record support plaintiff's claim that she was so "sexually harassed"

---

Navarro's various infractions similarly to Bottiglieri's or Sutherland's screaming. *See Davin v. Delta Air Lines, Inc.,* 678 F.2d 567, 571 (5th Cir. Unit B 1982); *Rohde v. K.O. Steel Castings, Inc.,* 649 F.2d 317, 322–23 (5th Cir. Unit A 1981); *Evans v. Interstate Brands Corp.,* 557 F.Supp. 562, 564 (N.D.Ga.1983) (motion for summary judgment); *EEOC v. Minneapolis Elec. Steel Casting Co.,* 552 F.Supp. 957, 963 (D.Minn.1982); *Pippin v. United States Truck Co.,* 520 F.Supp. 144, 148 (E.D.Mich.1981).

**33.** There was no evidence that plaintiff was denied equal access to the medical leave policy; rather, as indicated by Seidel's unsuccessful attempt to explain the leave requirements by telephone, Kramer-Navarro was given every opportunity to comply with the rules.

**34.** Kramer-Navarro asserts Seidel wrote her a warning letter but sent none to Bottiglieri or Sutherland, but, as Seidel testified, the letter was only in response to plaintiff's letter to him and that had Bottiglieri or Sutherland written to him he would have responded in writing to

them as well. Tr. 274. Plaintiff also suggests that Seidel held her to a standard of conduct based on a sexual stereotype. That Seidel hired plaintiff notwithstanding the language she used in her initial interview amply refutes this charge. *See* Tr. 96, 188.

**35.** Defendants' Ex. B–4; *see* Tr. 126.

**36.** It suffices to say that the various "threats" allegedly made against Kramer-Navarro by her co-workers, unlike that made by plaintiff against Bottiglieri, were not clearly communicated to Seidel, were not witnessed by any third party, or were not made on Post Office premises. *See* Tr. 28, 45, 50–55, 206–07, 331–32. It may be noted, however, that in light of these facts, plaintiff's lapses of memory, *see, e.g.,* Tr. 126, inconsistent statements, *see, e.g.,* Tr. 109, and evasiveness, *see, e.g.,* Tr. 116, as well as the substantial testimony contradicting plaintiff's description of the events in question, *see, e.g.,* Tr. 331–32, 345, the version of events related by plaintiff cannot be fully credited.

by her co-workers that she was constructively discharged in violation of the civil rights laws. Although Kramer-Navarro claims she experienced "anxiety" and "stress" as a result of her work, her self-serving statements prior to her absence without leave to the effect that she was afraid to come to work are belied by her failure to identify, to Seidel, her EEO officer, William Malson, Jr., or any other relevant person, the basis for her fears. Her vague allegations in her letters to Postmaster Seidel of harassment and abuse are no substitute for evidence that she had any objective reason to fear coming to work at Ardsley, and are repelled by the trial record. Given a fair reading, the record at most indicates that plaintiff had, by her hostile and belligerent attitude, succeeded in alienating her co-workers and provoking arguments at every turn. Even if her allegations of fear had some basis in fact,[37] there is no indication that her decision not to return to work was brought about by "the culpable neglect of supervisory personnel."[38] In any case, plaintiff repeatedly failed to act "in a manner reasonable under the circumstances."[39] The most striking example of this unreasonable conduct, of course, is that even when in the safety of her own home she told her superior to "go to hell" without giving him a chance to finish what he had to say and then, several hours later, left a message for him not to contact her again. Plaintiff's claim of constructive discharge is devoid of merit.[40]

**37.** *But see supra* note 36.

**38.** *DeGrace v. Rumsfeld,* 614 F.2d 796, 804 (1st Cir.1980); *accord, Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982); *Coley v. Consolidated Rail Corp.,* 561 F.Supp. 645, 650 (E.D. Mich.1982); *Robson v. Eva's Super Market, Inc.,* 538 F.Supp. 857, 862 (N.D.Ohio 1982). Kramer-Navarro never effectively communicated the basis for her "fear" to either her EEO officer or Seidel. *See* Tr. 73–74, 270, 364, 367; *supra* note 36.

**39.** *DeGrace v. Rumsfeld,* 614 F.2d 796, 804 (1st Cir.1980).

**40.** Plaintiff's claim that she was unlawfully denied a transfer, *see supra* note 2, is refuted by

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Judgment dismissing plaintiff's claims shall be entered in favor of the defendants.

So ordered.

the simple fact that she never properly applied for one, *see supra* note 15. Although the Court's determination that plaintiff was not terminated or constructively discharged in violation of the Civil Rights Act disposes of any alleged right plaintiff may have otherwise had to relief designed to alter the working conditions at Ardsley, so that there may be no mistake as to the scope of the Court's findings, the Court holds that plaintiff was in no sense "harassed" because of her sex or her engaging in protected conduct by any act of the defendants. *See Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983); *cf. id.* at 256 ("Title VII is not a clean language act ....").